**KENTUCKY BAR ASSOCIATION,**
Movant

v.

**Fred G. GREENE, Respondent.**

No. 2012–SC–000148–KB.

Supreme Court of Kentucky.

Nov. 21, 2012.

718

## OPINION AND ORDER

Pursuant to SCR 3.370(7),[1] the Office of Bar Counsel of the Kentucky Bar Association (Bar Counsel), seeks review of the Findings of Fact, Conclusions of Law, and

1. SCR 3.370(7) provides that "[w]ithin thirty (30) days after the Board's decision is filed with the Disciplinary Clerk, Bar Counsel or the Respondent may file with the Court a Notice for the Court to review the Board's decision stating reasons for review[.]"

Recommendations of the Board of Governors of the Kentucky Bar Association (Board) entered March 6, 2012, in this consolidated disciplinary proceeding involving alleged ethical violations by Respondent, Fred G. Greene, KBA Member No. 26890. Respondent was admitted to the practice of law in Kentucky on September 1, 1972, and his bar roster address is P.O. Box 490, Russellville, Kentucky 42276–0490.

This consolidated proceeding involves nineteen counts of alleged misconduct by Respondent involving four KBA files. Of the nineteen charges of misconduct, the Board found him not guilty of seventeen; the Board further found, however, that Respondent was guilty of violating SCR 3.130–1.5(a)[2] (charging an unreasonable fee) and SCR 3.130–1.15(a) (commingling of fees) in regards to a probate matter involving the Curtis Binkley estate, and recommended that he receive a forty-five-day suspension, probated for two years contingent upon completing additional CLE credits, for the first violation and a private admonition as punishment for the second violation. That recommendation stands in stark contrast to Bar Counsel's position that Respondent is guilty of all nineteen counts, and deserves a five year suspension.

Based upon our review of the record, the arguments of the parties, and the applicable ethical rules, for the reasons discussed below, we agree with the Board's findings, adopt their recommendations in full, and reject Bar Counsel's arguments in objection to the Board's decision, with the exception of the recommended punishment for Respondent's violations. In lieu of the punishment recommended by the Board, we instead impose a thirty-day suspension for Respondent's violation of SCR 3.130–1.5(a), without probation, and instead of the Board's recommendation of a private reprimand for his violation of SCR 3.130–1.15(a), we determine that a public reprimand is the appropriate disciplinary measure.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Inquiry Commission charged Respondent with nineteen counts of alleged misconduct based upon four KBA files; the files were subsequently ordered to be consolidated, and the Chief Justice appointed Roger Braden as the trial commissioner to preside over the consolidated proceedings. Following an evidentiary hearing, the trial commissioner issued a report finding Respondent guilty of only two of the nineteen counts; one involved charging an unreasonable fee and the other involved a conflict of interest. The trial commissioner found Respondent not guilty of the other seventeen charges.

As further discussed below, both of the violations found by the trial commissioner were related to the Binkley probate matter. The trial commissioner recommended that Respondent receive a forty-five-day suspension, probated for two years contingent upon completing additional CLE credits, as punishment for the fee violation, and a private admonition as punishment for the commingling of funds violation.

Pursuant to SCR 3.370(5)(a)(i),[3] the Board of Governors voted (fourteen to one

---

**2.** All references to the Model Code of Professional Conduct refer to the version and Supreme Court Rule number in effect at the time the alleged violations occurred.

**3.** SCR 3.370(5)(a)(i) permits the Board, after deliberation, and consideration of oral arguments, if any, to decide by a roll call vote "[t]o accept the Trial Commissioner's Report as to the guilt, innocence, and the discipline imposed, by concluding that the Trial Commissioner's report is supported by substantial evidence and is not clearly erroneous as a matter of law[.]"

with one member recused) to accept the trial commissioner's report, thereby ratifying in full his recommendations concerning the guilt and innocence of Respondent and the discipline to be imposed. Pursuant to SCR 3.370(7), Bar Counsel seeks review and urges that we reject the Board's decision, adjudge Respondent guilty of each of the nineteen charges of alleged ethical misconduct, and impose a five year suspension for the violations.

 We begin by noting that the Findings of Fact by the trial commissioner and the Board of Governors are advisory only. SCR 3.360; SCR 3.370(7). We accordingly undertake an independent review of the record and findings of fact. *Kentucky Bar Assoc. v. Berry*, 626 S.W.2d 632, 633 (Ky.1981). Moreover, upon a finding of guilt, it is our task to establish the appropriate sanction. *Kentucky Bar Ass'n v. Steiner*, 157 S.W.3d 209, 211 (Ky. 2005); SCR 3.380.

As further discussed below, upon review of each of the relevant Inquiry Commission files, we adopt the findings and disciplinary recommendations of the Board, and reject the Bar Counsel's arguments in opposition to this disposition.

## II. KBA FILE NO. 11959— (FOSTER FILE)

KBA File No. 11959 concerns Respondent's representation of JoAnn Foster in a domestic relations matter. In this file, Bar Counsel alleges that Respondent charged Foster an unreasonable fee, commingled the unearned fee with his office funds, and failed to return the unearned fee.

### 1. Background

On Friday, January 2, 2004, Foster met with Respondent to discuss having his law firm handle her divorce. Among other things, Foster discussed her concern that her husband was gambling and wasting their assets. Pursuant to Respondent's request, Foster paid him a $2,000.00 retainer fee that he deposited into his office operating account rather than into his client escrow account, which is the proper account for unearned fee deposits. Respondent admitted that, at the time of the deposit, he had not earned the entire $2,000.00 fee.

The evidence developed at the commissioner's hearing demonstrated that, during the initial visit, Foster was very distraught. To accommodate her, Respondent rescheduled other appointments and shifted other office work in order to attend to her situation. Respondent spent approximately six and a half to seven hours during the initial meeting evaluating the matter and drafting documents. Plans were made for Foster to return the following Monday to get a restraining order against her husband. However, over the weekend, Foster called and told Respondent not to proceed with the dissolution, but nevertheless to continue checking on whether liens had been filed against her property. Respondent's office records reflect that he did in fact continue to do additional work for Foster, invoiced Foster for this work, and eventually worked a total of at least fourteen to sixteen hours on her matters.

For reasons which are unclear, Foster ended the representation and demanded return of the entire $2,000.00 retainer, irrespective of any work Respondent may have done on her behalf. When he refused to return the fee, Foster filed a bar complaint against him. While the complaint was pending, she also sued Respondent in small claims court. After several judges recused themselves from the case, the parties appeared for what Respondent says he believed was a scheduling conference. Instead, the judge proceeded with the trial on the merits. Without his office records, timesheets, and witnesses, Re-

spondent lost the case. Judgment for Foster was entered in the sum of $1500.00. Respondent opted not to appeal and paid the judgment.

### 2. KBA Proceedings

As a result of the investigation that followed. JoAnn Foster's disciplinary complaint, the Inquiry Commission filed a three-count Charge against Respondent alleging violations of (I) SCR 3.130–1.5(a) (charging an unreasonable fee for his representation of Foster); (II) SCR 3.130–1.15(a) (commingling of unearned funds received from Foster with his office account funds); and (III) SCR 3.130–1.16(d) (failure to return an unearned fee after Foster terminated his representation). Respondent denied that he violated any rule in his handling of Foster's case.

The trial commissioner found Respondent not guilty of all charges. On review, the Board of Governors accepted the trial commissioner's determinations of not guilty.

### 3. Assessment of Guilt

At the evidentiary hearing, Respondent testified that he had provided at least fourteen to sixteen hours of work on Foster's case and produced his office timesheets to support this level of work. He also produced evidence that monthly invoices were sent to Foster as additional work was performed on her behalf.

Karen Monti, a paralegal employed by Respondent during the relevant time period, provided evidence supporting the amount of work performed on the Foster matter. According to Monti, Foster claimed that Monti had written on a business card the hourly rate she would be billed for Respondent's legal services. Monti denied having put the rate on the business card. Monti also stated that Foster had contacted her and tried to get her to "go along with some of her financial

thoughts," and to confirm Foster's version of the fee agreement.

Foster did not testify at the commissioner's hearing, and Bar Counsel did not take her deposition at any time prior to the hearing. Bar Counsel argued that the small claims judgment was *res judicata* on the issue of the excessive fee, but otherwise presented no direct evidence concerning the Foster representation. Bar Counsel did introduce inconsistent statements Respondent made regarding the amount of time he worked on the Foster file.

Nevertheless, there was evidence before the trial commissioner supporting Respondent's testimony that he performed fourteen to sixteen hours of work on the Foster case. Obviously a fee of $2,000.00 for this amount of work (less than $150.00 per hour) is not unreasonable, particularly considering the extraordinary efforts made to accommodate Foster during her initial, highly distraught, visit to the office. Nor would a $2,000.00 advance retainer for this type of case be unreasonable given the circumstances presented. By depositing of the funds directly into his office account rather than his client escrow account, Respondent committed a violation. That violation was, however, mooted in the short time it took Respondent to perform services that earned the fee.

"The burden of proof shall rest upon [Bar Counsel] in a disciplinary proceeding, and the facts must be proven by a preponderance of the evidence." SCR 3.330. Because Bar Counsel failed to present any testimony to refute Respondent's evidence, the alleged violation was not proven by a preponderance of the evidence. As such, based upon the evidence presented at the evidentiary hearing as discussed above, we determine that Respondent did not charge an unreasonable fee in violation of SCR 3.130–1.5(a) and he did not fail to return an unearned fee in violation of SCR 3.130–

1.16(d). The brief comingling of client funds with the law firm's funds (SCR 3.130–1.15(a)) was of such duration that we agree with the Board's conclusion that discipline is not warranted.

Bar Counsel also argues that we should recognize, under the principles of collateral estoppel and issue preclusion, that the small claims judgment conclusively establishes Respondent's ethical violations regarding the fees charged to Mrs. Foster, and thus bars further adjudication under our rules to determine his guilt. As noted by Bar Counsel, we have in the past recognized that prior court decisions may be applied as *res judicata* in bar disciplinary proceedings. *See Kentucky Bar Ass'n v. Harris*, 269 S.W.3d 414 (Ky.2008) (Decisions of administrative agencies acting in a judicial capacity are entitled to the same *res judicata* effect as judgments of a court); *Kentucky Bar Association v. Horn*, 4 S.W.3d 135, 137 (Ky.1999) (In disciplinary proceedings, a judgment of a court is considered conclusive proof that the alleged conduct occurred); *Atherton v. Kentucky Bar Ass'n*, 308 S.W.3d 197 (Ky. 2010) (Bankruptcy court's order finding attorney failed to obtain proper approvals to secure payment for services rendered constituted conclusive proof that the attorney engaged in conduct described in the order and thus engaged in professional misconduct, for purposes of subsequent disciplinary proceedings); *Kentucky Bar Ass'n v. Schilling*, 361 S.W.3d 304 (Ky. 2012) ("the Sixth Circuit decision is undoubtedly a final decision on the merits; and by virtue of the requirement that he disgorge all fees associated with the case, Schilling was the losing party. So we cannot disregard the opinions of the federal courts in this matter.").

■ However, in order for issue preclusion to operate as a bar to further litigation, certain elements must be met: (1) the party to be bound in the second case must have been a party in the first case; (2) the issue in the second case must be the same as the issue in the first case; (3) the issue must have been actually litigated; (4) the issue was actually decided in that action; and (5) the decision on the issue in the prior action must have been necessary' to the court's judgment and adverse to the party to be bound. *Miller v. Administrative Office of Courts*, 361 S.W.3d 867, 872 (Ky.2011). The rule contemplates that the court in which the doctrine is asserted will inquire into whether the judgment in the former action was in fact rendered under such conditions that the party against whom the doctrine is pleaded had a realistically full and fair opportunity to present his case. *Id.*

■ In the Foster matter, we are satisfied that the issues before the district court in the small claims action were not sufficiently congruent with the issues in the disciplinary cases, and therefore the doctrine of *res judicata*, or issue preclusion, in this instance, does not operate to compel a finding of guilt in the disciplinary matter. As we see it, all that small claims court resolved was a contract dispute, and it found that Foster was owed a sum of money ($1500.00) by Respondent. That finding does not necessarily rest upon whether Respondent's fee was unreasonable, and it has nothing to do with the account into which the retainer was deposited. Nor, does the small claims judgment necessarily depend upon the reasonableness of Respondent's refusal to refund the fee when Foster first demanded it. Not every fee dispute between a lawyer and a client presents an ethical issue. That the lawyer loses the contractual dispute does not conclusively establish an ethical violation.

Further, a more fundamental reason exists that the doctrines of *res judicata* and issue preclusion will not conclusively re-

solve the adjudication of a bar disciplinary matter. The purpose of small claims court as established by the General Assembly is expressed in KRS 24A.200:

> The purpose of KRS 24A.200 to 24A.360 is to improve the administration of justice in small noncriminal cases, and make the judicial system more available and comprehensible to the public; to simplify practice and procedure in the commencement, handling, and trial of such cases in order that plaintiffs may bring actions in their own behalf, and defendants may participate actively in the proceedings rather than default; to provide an efficient and inexpensive forum with the objective of dispensing justice in a speedy manner; and generally to promote the confidence of the public in the overall judicial system by providing a forum for small claims.

As stated by the statute, the concept of small claims court is to provide a forum to resolve "small noncriminal cases," quickly and cheaply. The processes established by the legislature for such cases is not consistent with the Rules we have established pursuant to our responsibility under Section 116 of the Kentucky Constitution for the adjudication of bar disciplinary matters. Nor are the small-claims processes well-suited for the adjudication of bar disciplinary matters.

The public policy implicit in using small claims courts to decide "small" disputes quickly and cheaply takes at least some measure of priority over getting a more deliberate, cautious, and well-researched decision. If a small claims judgment is deemed to be *res judicata*-worthy, it is unlikely that any lawyer would ever submit to a small claims dispute with a client.

Therefore, while we have recognized the *res judicata* effect of other tribunals, for reasons particular to the small claims process and the role of the legislature in establishing the rules for that process, we decline to extend *res judicata* to small claims decisions in bar disciplinary matters as against public policy.

### 4. Summary

For the reasons stated, we adopt the determination of the Board that Respondent is not guilty of each of the charges set forth in Case File 11959.

### III. KBA FILE NO. 12152— (BINKLEY AND HITE)

KBA File 12152 involves two. unrelated representations. The Binkley matter concerns Respondent's representation of the estate of Curtis Binkley in a probate proceeding, and the Hite matter concerns Respondent's representation of Barbara Hite concerning the sale of a family business and a loan to her son.

As a result of the conduct described below, on September 22, 2004, the Inquiry Commission filed an Inquiry Commission Complaint against Respondent regarding his conduct during his representation of the Curtis Binkley Estate and of Barbara Hite. Following its investigation, and subsequent to a period in which the case was held in abeyance, on February 10, 2009, the Inquiry Commission filed an eight-count Charge against Respondent alleging the following rule violations in the Binkley representation: (I) SCR 3.130–1.3 (lack of diligence); (II & III) SCR 3.130–1.5(a) (charging an unreasonable fee—two counts); (IV) SCR 3.130–1.7(b) (conflict of interest); (V) SCR 3.130–1.15(a) (commingling of funds); (VI) SCR 3.130–8.3(b) (engaging in criminal conduct); (VII) SCR 3.130–8.3(c) (engaging in dishonesty). The Inquiry Commission further charged Respondent with the following violation in the Hite matter: (VIII) SCR 3.130–1.5(a) (unwritten contingency fee arrangement). Respondent filed an Answer denying all Rule violations as alleged by the Inquiry Commission in the Binkley–Hite matter.

Because the Binkley and Hite matters are unrelated, we discuss the facts and disposition of the two cases separately.[4]

## I. BINKLEY REPRESENTATION

### A. Count I—SCR 3.130–1.3 (failure to act diligently)

The Binkley file concerns Respondent's representation of the estate of Curtis Binkley, who died in an accidental fall on June 14, 2002. The will, prepared by Respondent, named Respondent as executor of the Estate and also as attorney for the estate. Respondent filed a petition to probate the will, and was appointed executor two days later.

In connection with his duties under the will, Respondent set up an educational trust fund honoring Binkley's wife and performed other tasks, including handling a boundary dispute. The gross value of the Estate was approximately $691,000.00. Thus, the Estate was, arguably, somewhat complex, though Bar Counsel rejects this conclusion.

■ The administration of the Estate was not executed without error. For example, in connection with the representation, errors were included in the Estate documents (which were prepared in part by Respondent's recently licensed wife and son); the initial inventory was late; the final settlement was late; and reminders had to be sent out by the court because of these delinquencies. The diligence charge is because of this tardiness and the carelessness in filling out the probate forms. Evidence was presented, however, that it is not unusual for inventory sheets and final settlements to be late, and no action was taken against Respondent by the probate court. It was noted at the hearing that on the same docket that Respondent's filings were listed as being delinquent, an

estate being represented by a former KBA president was also delinquent, and no similar disciplinary action was taken against that individual. Further, it appears the erroneous forms were corrected and no prejudice to the Estate resulted from the original errors.

Upon review, we agree with the trial commissioner and Board that the carelessness and tardiness at issue in this case does not merit a finding of guilt for lack of diligence in violation of SCR 3.130–1.3.

### B. Count II—SCR 3.130–1.5(a) (charging an unreasonable fee)

■ Count II concerns an unusual—if not unprecedented—fee arrangement that Respondent had with Curtis Binkley. During the last twenty-eight years of Curtis's lifetime, dating back to 1974, Respondent provided legal services to Curtis (and his wife) on a regular basis; for example, Respondent would provide legal work pertaining to insurance policies and materials Curtis had received through the mail. Pursuant to their fee arrangement, which was at Curtis's initiative and insistence, any payment for the services was to be deferred until Curtis's death. Pursuant to this arrangement, Curtis's last will and testament, which was prepared by Respondent, contained a provision stating to the effect that Respondent was entitled to be paid for the legal services he had previously provided over the years.

Based upon the specific provision contained in the will, and the prior work done, Respondent paid himself a fee, as a creditor of the estate, of $35,000.00 for the prior legal services. In Respondent's view, this was a "conservative" estimate which was based upon performing one hour of work per month for Curtis (and his wife) during the years Respondent served as Curtis's

---

4. Because of the number of charges involved in the Binkley matter, we also combine our assessment of guilt determination within our discussion of each Count.

attorney, and he believed this amount to be a fair and reasonable charge. Respondent placed the $35,000.00 in escrow pending approval of the probate court.

■ When the matter was raised before the probate court, the probate court determined that Respondent was indeed entitled to a fee for the work performed, determined that that work dated back to 1974, but denied the amount of the fee based upon Respondent's failure to produce documentation in support of the assessed fees. The probate court accordingly limited his fee to $2,500.00.[5]

Based upon this set of facts, in Count II of the Binkley matter the Inquiry Commission charged Respondent with "charging an unreasonable fee." While it is clear that Respondent was unable to document the time spent over the twenty-eight years of representation in question, in our assessment of guilt we are persuaded by the trial commissioner and Board's conclusion that "Respondent had a 'reasonable' legitimate basis for his 'belief' that he was entitled to $35,000.00 [in] attorney fees for prior work done for the Binkleys.... Respondent, due to his relationship with Mr. Binkley, simply failed to maintain adequate records and/or attorney-client agreements to substantiate the amount of fees requested for work done prior to Mr. Binkley's death. Respondent, in his role as a creditor, submitted a bill for the work

he believed he was entitled.... As an attorney who has performed prior work for the Binkleys, Respondent's failure to maintain documentation substantiating his prior work, does not make his request for $35,000.00 in attorney fees unreasonable or unethical." We accordingly find Respondent not guilty of Count II of the Binkley file.

**C. Count III—SCR 3.130–1.5(a) (charging an unreasonable fee)**

Count III of the Binkley file also concerns an allegation of charging an unreasonable fee. As previously noted, Binkley acted as both executor and as attorney for the Estate. This charge is based upon Bar Counsel's allegation that "Respondent made conflicting claims to the $71,152.00 he self-disbursed from the estate between September 2002 and May 2004. Labeling payments as legal fees for that estate or executor's fees." Bar Counsel contends that Respondent's "testimony on the purposes for his self-disbursements was bewildering, contradictory, and not credible."

The evidence discloses that in addition to the $35,000.00 for past legal fees just discussed, Respondent also paid himself $71,152.00 from Estate funds, which divides out to about 10.3 percent of the gross value of the Estate, and that he made the disbursements without the prior approval of the probate court.[6] Upon review, the

---

5. As a result of the probate court proceedings concerning amounts withdrawn by Respondent during the probate process, and its orders requiring Respondent to refund amounts back to the estate, Bar Counsel contends that many of the charges relating to the Binkley estate matter are controlled by *res judicata*, in that it was established in those proceedings that Respondent removed excessive funds from the Estate. Bar Counsel also contends that the circumstances in this case are similar to the "pre-death service fees" we condemned in *KBA v. Profumo*, 931 S.W.2d 149 (Ky. 1996). As in the Foster matter, we decline to apply *res judicata* as dispositive of the issues

in the Binkley matter because different standards apply as to the issues under review in the probate case versus those applicable to a disciplinary case. In the probate case the issue was whether Respondent had actually justified the fees charged, whereas in the disciplinary proceedings the issue was whether Respondent had a *reasonable belief that* the fee was reasonable. Accordingly, there is not a strict identity of issues between the two cases.

6. Respondent also concedes that he mistakenly transferred an additional $15,670.00 into his account which belonged to the Estate.

728

probate court reduced the fee to $19,011.00.

KRS 395.150(1) limits the compensation of an executor for services to five percent of the value of the personal estate of the decedent, plus five percent of the income he collects. Notwithstanding this limit, KRS 395.150(2)(a) provides that "Upon proof submitted showing that an executor, administrator or curator has performed additional services in the administration of the decedent's estate, the court may allow to the executor, administrator or curator such additional compensation as would be fair and reasonable for the additional services rendered, if the additional services were: (a) Unusual or extraordinary and not normally incident to the administration of a decedent's estate[.]" In addition, if "a court finds an executor is deserving of pay for extraordinary services over and above the usual commission, it should make a specific finding to that effect. Without such a finding, the excessive fee should be disallowed." *See Panke v. Louisville Trust Co.*, 303 Ky. 579, 198 S.W.2d 313 (1946); *Hale v. Moore*, 289 S.W.3d 567, 583 (Ky.App.2008). It is undisputed that no such specific finding was made by the probate court in this case.

Further, it is well-settled that an attorney who accepts appointment as an executor cannot also serve as legal counsel for the estate *and receive dual compensation for the additional role*, absent approval of such an arrangement in the will. *Clay v. Eager*, 444 S.W.2d 124 (Ky.1969); *Kentucky Bar Ass'n v. Profumo*, 931 S.W.2d 149 (Ky.1996) (To receive dual compensation as executor and estate's attorney, one must have been appointed and identified as both executor and attorney in the will so as to evince testator's intention that attorney be compensated in both capacities).

Here, Respondent concedes that he acted as both executor and as attorney for the Estate, but denies that he took attorney fees for work he performed for the Estate. However, the initial Final Settlement statement included *"legal fees"* for three checks totaling $40,000.00. Respondent attributes this entry to errors made by his inexperienced wife and son, and argues that he corrected the mistake upon its discovery. He therefore alleges that the fees were executor fees, not legal fees. The trial commissioner accepted this explanation, and found that he did not improperly accept attorney fees and executor fees.

Nevertheless, the trial commissioner and the Board determined that Respondent violated *Profumo* and KRS 395.150(2) in at least two ways: (1) because he took executor fees for "unusual or extraordinary" services from the Estate account without the prior consent and approval of the probate court, and (2) by failing to provide the required documentation corroborating the fees for "unusual or extraordinary" services.

Additional compensation is allowed only upon consent of the court and after submission of proof detailing the services rendered. KRS 395.150(2). As a result, Respondent cannot rely on this exception since he neither asked the probate court to allow additional compensation nor presented evidence to the probate court justifying the fee. *Profumo*, 931 S.W.2d at 150.

We thus agree with the trial commissioner and the Board that Respondent violated SCR 3.130–1.5(a), charging an unreasonable fee, in regard to the conduct described in Count III. We disagree with the trial commissioner and the Board, however, that an appropriate sanction for this violation is a suspension from the practice of law for forty-five days, with that suspension being probated for two years. Upon careful consideration of Appellant's conduct in charging an unreason-

able fee, taken as a whole, we believe that a thirty-day, unprobated, suspension is the proper disciplinary sanction, with the requirement that Respondent complete six additional CLE credits in addition to the number of required yearly CLE credits, with those additional credits being specific to office management, client agreements, and billing practice requirements under the applicable Supreme Court Rules. *See Kentucky Bar Ass'n v. Glidewell,* 241 S.W.3d 316 (Ky.2007) (holding that suspension for forty-five days, with requirement of paying restitution of $479.50 to client plus costs, was appropriate disciplinary sanction for attorney's conduct, relating to representation of client in divorce action, in failing to act with diligence, failing to keep client informed, failing to adequately explain matters to client, and failing to return unearned advance-fee upon termination of representation, and for attorney's conduct in failing to respond to two letters from Office of Bar Counsel seeking explanation of inconsistencies in attorney's response to bar complaint).

### D. Count IV—SCR 3.130–1.7(b) (conflict of interest)

As previously noted, Respondent served as both executor for Curtis Binkley's Estate, and as the Estate's attorney. As a result of this dual representation, Respondent was charged by the Inquiry Commission with one count of violation of SCR 3.130–1.7(b), which provides in part: "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests...." Bar Counsel contends that "[t]he conflict between his two roles is proven by his actions: authorization and self-disbursement of various fees totaling over $106,000.00, but the district court ultimately ruling he was only entitled to a mere fraction—about one-fifth—of that amount."

■ Before the trial commissioner, Bar Counsel presented no witnesses to contradict Respondent's testimony that it was customary for an attorney to serve both as executor and as attorney for an estate. It bears emphasis that *Profumo* does not prohibit an attorney from serving in both roles, it merely prohibits an attorney from receiving a fee for both services. Nor are we cited to any statute which would prohibit an attorney from serving in both roles. In this vein, obviously there are cost savings to a single attorney serving in both roles. Further, it is worth noting that the probate court did not question this dual role.

Because of Respondent's history with Binkley, acting as both executor and attorney for the Estate, is, perhaps, understandable. The Estate involved several complex issues such as setting up a trust; obtaining tax exempt status for the trust; and resolving a boundary dispute. These duties were, apparently, carried out in a reasonable manner. We accordingly agree with the trial commissioner and the Board that Respondent's serving as both executor and attorney for the Estate did not materially limit the duties owed to his client or necessarily indicate the he put his own interests above his client's, and assess that Respondent is not guilty of this charge.

### E. Count V—SCR 3.130–1.15(a) (commingling of funds)

■ As previously noted, during the course of his representation of Curtis's Estate, Respondent made a transfer of the remaining amount in the Estate account of $15,669.59 into his office account.

SCR 3.130–1.15(a) states in part that "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from a lawyer's own property. Funds shall be kept in a separate account

maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person." Respondent admits that the improper transfer occurred, but denies that he directed the transfer, and maintains that once the mistake was discovered he transferred the funds back into the Estate account. Former law firm employee Beth Goodman, however, testified that Respondent directed her to make the transfer. Another employee, James Greene, made the actual deposit into the office account. The funds were in the office account for several months before being transferred back into the Estate account.

While Respondent attributes the transfer to a mistake, nevertheless, Respondent is responsible for his firm's transactions, directly, or by failing to have properly trained persons, or to have succinct policies and procedures in place, which caused and/or allowed the funds to be placed in an improper account. We accordingly find Respondent guilty under this charge.

■ In assessing punishment, it bears emphasis that the evidence is insufficient to establish a nefarious motive to the transfer. Nevertheless, in light of the significance of this violation, we assess that a public, rather than a private, reprimand as the proper sanction for this violation. *See Kentucky Bar Ass'n v. Burroughs*, 578 S.W.2d 39 (Ky.1979) (The Supreme Court adopted the decision of the Board of Governors that commingling funds with those of a client constitutes unethical and unprofessional conduct and warrants public reprimand); *Hines v. Kentucky Bar Ass'n*, 122 S.W.3d 66 (Ky.2003) (Attorney's acquiring an interest in his client's real estate, and thereby commingling the client's

property with his own property, warranted public reprimand).

**F. Count VI—SCR 3.130–8.3(b) (committing a criminal act)**

■ The Commission charged Respondent with violating SCR 3.130–8.3(b) by converting $1,000.00 of Estate funds to his own use and paying them to Beth Goodman in October 2002 as a "bonus" Respondent had promised to Goodman for work which was not related to work Goodman performed on the Binkley Estate. Though Respondent was never actually criminally charged as a result of this payment, as noted by Bar Counsel, an attorney can be guilty of a violation of SCR 3.130–8.3(b) even in the absence of criminal charges or a conviction. *KBA v. McDaniel*, 205 S.W.3d 201 (Ky.2006). In this case, the "criminal act" alleged by Bar Counsel is theft by failure to make required disposition in violation of KRS 514.070.

■ At the hearing, Respondent presented evidence that Goodman had done additional work for the Binkley Estate that she considered above and beyond her regular duties outside of her regular work hours. For example, she helped go through documents at Binkley's residence during the probate process, and prepared items for auction. As such, the evidence supports Respondent's defense that any funds used to pay Goodman out of the Estate account was for work performed on the Estate, and Bar Counsel has failed to prove its case by a preponderance of the evidence. As such, we determine Respondent is not guilty under this charge.[7]

**G. Count VII—SCR 3.130–8.3(c) (engaging in dishonesty, fraud, or deceit)**

7. Bar Counsel further complains that the trial commissioner erred by refusing to admit Goodman's deposition testimony into evidence. The deposition was introduced into the record by avowal and, upon review, we are persuaded that the introduction of the deposition at the hearing would not have changed the result of the proceedings.

The final charge involves two events already discussed: the transfer of the $15,669.59 from the Estate account into Respondent's office account and the payment of $1,000.00 to Goodman from the Estate account. As has been discussed, Bar Counsel has failed to show that the payment to Goodman was not for work done for the Estate, or that the transfer was not a product of miscommunication and deficient office policies rather than for disreputable purposes. As such, we determine Respondent to be not guilty under this charge.

## II. HITE REPRESENTATION

■ The evidence demonstrates that the Hite family owned an interest in a concrete company located in Russellville. Ricky Hite ran the business and he and his mother, Barbara Hite, both owned stock in the business. Barbara, now deceased, had previously made a loan to Ricky. In 2000, Ricky was in the process of negotiating the sale of the business, and other family members urged Barbara to be careful that she got all of the money due to her from the sale of the business and the loan. Taking their advice, Barbara hired Respondent.

As a consequence of the representation, Respondent negotiated a settlement with Ricky with which Barbara was happy. Respondent thereafter negotiated a $20,000.00 fee with Barbara, which was twenty-two percent of the total amount received by Barbara from her settlement with Ricky.

Though no one seemed to be complaining about Respondent's representation of Barbara, the Inquiry Commission nevertheless charged Respondent with charging a contingency fee for the representation which was not in writing. The charge appears to be based primarily upon the mathematical result that his fee was twenty-two percent of Barbara's settlement with Ricky, which would, for what it is worth, be circumstantial evidence that there was a contingency arrangement. In his answer, somewhat in contradiction of his hearing evidence, he indicated that there was a contingency fee arrangement, but that it would "only take effect if actual litigation occurred"; instead the matter was, of course, settled.

At the hearing Barbara's daughter, Jana Hite, testified that Barbara was satisfied and pleased with the work Respondent performed. Jana was also satisfied with Respondent's participation in the sale of the family business. Significantly, they did not file a bar complaint as a result of this representation. Respondent testified that he negotiated the $20,000.00 fee with Barbara, that there was no contingency fee, and that it was merely a coincidence that the result was that the fee was twenty-two percent of the settlement amount.

Because there is no evidence—other than the twenty-two percent coincidence—that the $20,000.00 fee was the product of a contingency fee agreement, Bar Counsel has failed to prove this charge by a preponderance of the evidence, and we accordingly find Respondent not guilty under Count VIII.

## III. SUMMARY

For the reasons stated, we determine that Respondent is not guilty of charges (I), (II), (IV), (VI), (VII), and (VIII); but is guilty of charges (III) and (V) contained in Case File 11959. Further, as punishment, we determine that Respondent should receive a thirty-day suspension, with the requirement he complete six additional CLE credits for his violation of SCR 3.130–1.5(a), and that he receive a public reprimand for his violation of SCR 3.130–1.715(a).

## IV. KBA FILE NO. 16974— (MCPHERSON/MCGUIRE FILE)

This file concerns Respondent's role in a failed land contract between Richard and Dennis McPherson and Lela McGuire for the sale and purchase of a farm; Respondent's subsequent representation of the McPhersons in a foreclosure action concerning the farm and the subsequent private sale of the property; his handling of an escrow account relating to the sale; and Dennis's concern that he had been improperly charged for certain amounts paid to McGuire.

### 1. Background

Evidence presented before the trial commissioner in KBA File No. 16974 disclosed that Richard McPherson and his brother, Dennis, co-owned a farm, and that in 2005 they attempted to enter into a land contract with Lela McGuire by which she would purchase the farm. Respondent had previously represented Richard in a criminal matter and had previously represented McGuire in an earlier dispute involving a different farm.

According to Respondent and McGuire, Respondent did not actually have input into the negotiations and terms involved with the land contract; rather, McGuire actually drafted the contract and Respondent's secretary, Jo Ann, typed it into final form. Richard testified that he did not know if Respondent was involved in creating the land contract. Thus, the uncontested evidence from the only knowledgeable witnesses was that he was not.

In addition to permitting his secretary to type the contract, Respondent also allowed the McPhersons and McGuire to meet at his office to discuss and review the contract. Respondent testified that he told them "it was their deal, not his," and also told them "If you all—as long as you all agree that's great. But if you ever disagree, you've got to get your own attorneys." According to Respondent, the McPherson brothers and McGuire agreed that they would split the cost of preparing the document and staff time, use of his office, copying, and other office resources. Thus, the arrangement between Respondent and the land contract parties may fairly be described as a lending of the law office's staff and other resources for a fee, without any legal representation to either side by Respondent.

As part of this process McGuire also prepared a lien regarding the land contract and attempted to file it with the county clerk, who informed her that the document could not be filed without Respondent's signature. McGuire thereupon gave the lien document to Jo Ann, who told McGuire that she would take care of it. The lien, bearing Respondent's signature, was eventually filed as an encumbrance against the McPherson farm. McGuire testified that she never discussed the lien with Respondent. Ultimately the deal between the McPherson's and McGuire fell through, which resulted in litigation between the two sides.

In the meantime, Dennis owed money to Two Rivers and several other creditors, and Two Rivers had obtained a judgment against him and had placed a judgment lien on the farm. After Two Rivers undertook a foreclosure action, Dennis approached Respondent about the matter, and Respondent attended a meeting with Two Rivers involving the foreclosure action. At the evidentiary hearing, Respondent testified that he was unsure whether Richard was a defendant in the foreclosure action (although it appears that he would have had to have been since he was a co-owner of the farm.)

It appears that the foreclosure action was avoided because the farm was ultimately sold, with Respondent's assistance, through a private sale. Thus, after the

deal with McGuire fell through, Respondent represented Richard and Dennis in selling the farm. The farm sold for $381,281.00, with each of the brothers assigned $190,640.50 from the proceeds. However, Dennis was deeply in debt and his share of the proceeds was consumed by his creditors. In addition, in order to facilitate the sale, Richard agreed to absorb $7,460.86 in amounts owed to other creditors by Dennis, thereby reducing the amount Richard was to receive. After the sale of the farm, Richard left his proceeds in an escrow account controlled by Respondent, who would disburse amounts to Richard from time to time.

Meanwhile, the litigation between McGuire and the McPherson's continued. The parties retained other counsel to represent them in that litigation. McGuire retained James C. Milam, who testified before the trial commissioner; the McPhersons retained Danny Hicks to represent them. During the course of the McPherson–McGuire litigation, Respondent re-entered into the picture. More specifically, in connection with the litigation, an escrow account was established which was overseen by Respondent. He also hosted a meeting at his office for the purpose of trying to resolve the dispute, though he was not hired as a mediator, and he was not paid for his participation in the meeting.

As that process developed, it was eventually agreed that the McPhersons would pay McGuire $17,000.00, which was to be paid exclusively from Dennis's account. This amount was eventually disbursed to McGuire, less $1,533.50 in attorney fees. Richard, however, initially believed that the attorney fees had been charged to him, and, as a result, he filed a bar complaint against Respondent. Upon review of the settlement disbursement documents, however, Richard agreed that he was mistaken

and that the fees were charged against Dennis as they should have been.

During the process a dispute between the parties developed over the release of monies from the escrow account. Respondent took the position that he needed a court order to release any funds, and apparently at some point Logan Circuit Judge Tyler Gill issued an order that the funds be paid over to the circuit court clerk. By letter dated June 8, 2007, Attorney Hicks informed Respondent that "Judge Gill did not seem pleased that the monies he ordered paid to the Clerk had not been delivered. Please either comply with my written request of April 2, 2007, or speak with Judge Gill directly concerning this matter." On July 2, 2007, Respondent paid the escrow balance to the circuit court clerk. Bar Counsel did not call Hicks to testify at the hearing before the trial commissioner, nor was his April 2, 2007, letter introduced into evidence.

### 2. KBA Proceedings

As a result of the above events, Richard McPherson filed a Client Security Fund action against Respondent relating to the $1,533.50 in attorney fees he believed had been charged to him which, due to the allegations, was also opened as a bar complaint. Following Respondent's Answer, the Inquiry Commission filed a four-count Charge against Respondent alleging the following Rule violations: Count I: SCR 3.130–1.1 (requiring an attorney to represent a client competently by engaging in a course of conduct wherein he failed to act in the McPhersons' best interest, including his drafting or participation in the drafting of a legally deficient April 25, 2005 Land Contract; his drafting or directing of the drafting and filing of the lien against the McPhersons' farm, which was the subject of an ongoing case in which he was representing the McPhersons; and his attempting to act as a mediator between the

McPhersons and McGuire to mediate disputes arising from the April 2005 Land Contract he drafted and the August 2005 lien he drafted and filed for McGuire); Count II: SCR 3.130–1.1 (prohibiting representation where there is a conflict of interest by drafting and filing, or assisting therein, the August 2005 lien for McGuire against the McPherson farm, which was the subject of pending litigation in which Respondent was representing the McPhersons); Count III: SCR 3.130–1.15(c) (requiring that client property be kept separately from the attorney's property by unilaterally taking $1,533.50 of farm sale proceeds he held in escrow prior to depositing funds with the court in the McPherson/McGuire litigation, and by making disbursements to Richard McPherson from the farm sale proceeds that Respondent held in escrow); and Count IV: SCR 3.130–3.4(c) (knowingly disobeying an obligation under the rules of a tribunal by failing to deposit into court as ordered the gross proceeds of the November 2005 farm sale.)

The trial commissioner subsequently found Respondent not guilty of all charges. On review, the Board of Governors accepted the trial commissioner's determinations of not guilty.

### 3. Assessment of Guilt

 Upon review of the evidence, we agree with the trial commissioner and the Board that Richard McPherson was in error in his belief that some of his monies were being taken to pay McGuire. Upon review of the relevant documents, Richard himself admitted as much. Further, the evidence supports their conclusion that Respondent merely attempted to facilitate a resolution to the McPherson–McGuire dispute and never functioned in the role as a formal mediator or received payment for hosting the meeting between the parties in his offices. Moreover, Bar Counsel failed to prove by a preponderance of evidence that Respondent ever saw Judge Gill's order relating to the escrow account or, it follows, intentionally chose to ignore or violate the order.

### 4. Summary

For the reasons stated, we adopt the determination of the Board that the Respondent is not guilty of each of the four charges contained in Case File 16974.

## V. KBA FILE NO. 17439 (CARNEAL)

KBA File No. 17439 concerns Respondent's representation of David Carneal in an action involving an ex parte motion for custody of his children, and his later representation of Lisa Potter in an action involving a motion for de facto custodianship of the same children. The essential allegation by Bar Counsel is that the Respondent's representation of Potter in the later case was materially adverse to his former client's (Carneal's) interest in a substantially related matter and that, during his representation of Carneal, he mislead the Court by seeking custody on behalf of Carneal, when the actual plan was for Potter to remain in care of the children.

### 1. Background

David Carneal is the father of two children, Jasmine and Devin. Heather Carneal is the natural mother of the children and Carneal's ex-wife, and Lisa Potter is her stepmother. Potter is accordingly the step-grandmother of the children.

Following the birth of the children, Potter provided much of the child-care for the two children, especially Devin, for whom Potter acted as the "mother and father to ... since he was three weeks old." A principal reason for this arrangement was that both Carneal and Heather suffered from substance abuse and incurred periodic occasions of incarceration. However, Heather would have custody of the children for periods of time.

In late November 2007, Heather had custody of the children; however, she had outstanding warrants against her and was facing arrest. Carneal had just gotten out of prison.. As a result of this, Potter introduced Carneal to Respondent and a plan was made for Carneal to seek temporary custody of the children. On November 28, 2007, Circuit Court Judge Tyler Gill signed an ex parte order granting Carneal temporary custody of the children. Afterward, the children (Devin full-time and Jasmine part-time) continued to remain in Potter's care with Carneal's agreement.

Shortly after the custody proceedings Carneal was arrested and incarcerated for manufacturing drugs. A short while later Potter contacted Respondent and explained to him that she had been informed by the doctor of one of the children that he would not treat the child because Potter did not have proper authorization to make medical decisions for the child.

In an effort to address this problem, Respondent filed, on behalf of Potter, a "Motion for De Facto Custodianship of [Devin]." At the time Carneal was still incarcerated and it was believed that Heather was in drug rehabilitation. The motion did not seek child support from Carneal. During a hearing on the de facto custodian motion, Carneal was brought into the courtroom from jail. Clearly, Carneal thought that something was going on adverse to his interests because during the course of the hearing he stated to Respondent that "he thought Respondent represented him" and that "he didn't want to pay child support." On December 1, 2008, Judge Gill signed an order which permitted Devin to remain in Potter's care, and which presumably also resolved the medical care issue.

After Carneal filed his bar complaint, Respondent withdrew from the case. Potter later sought child support using the services of another attorney.

## 2. KBA Proceedings

As a result of the above conduct on March 16, 2009, Carneal and his current wife filed a bar complaint against Respondent pertaining to Respondent's representation of him. On July 21, 2009, the Inquiry Commission filed a four-count charge against the Respondent alleging the following violations: (I) SCR 3.130–1.9(a) (conflict in representation with a former client for representing Potter in a custody dispute against his former client Carneal); (II) SCR 3.130–1.2(d) (scope of representation); (III) SCR 3.130–3.3(a)(2) (failure to disclose a material fact to a tribunal); and (IV) 3.130–8.3(c) (dishonesty, fraud, deceit or misrepresentation). The basis for the latter three charges was Respondent's statement to the Inquiry Commission that, "[t]he plan [in his initial representation of Carneal] was for David Carneal to obtain legal custody and then give 'actual custody' back to Ms. Potter," thus appearing to mean that he had misled the trial court into believing that Carneal would be the physical custodian when, in fact, Potter would be. Respondent subsequently filed an Answer denying all charges in the Carneal matter.

The trial commissioner subsequently found the Respondent not guilty of all charges. On review, the Board of Governors accepted the trial commissioner's determinations of not guilty.

## 3. Assessment of Guilt

We agree with the Board that Respondent's representation of Carneal in the 2007 temporary custody case and Potter in the 2008 de facto custody case did not violate SCR 3.130–1.9(a). This rule provides that "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former

client unless the former client gives informed consent, confirmed in writing."

Here, Respondent's representation of Potter was not adverse to his prior representation of Carneal. Indeed, the evidence shows that Carneal was at all relevant times in favor of Potter caring for his children, just as she had always done. Significantly, the Respondent's representation of Potter was not to deprive Carneal of custody of his children—he was incarcerated anyway and in no position to exercise physical custody. Nor was the representation in any manner for the purpose of obtaining child support from Carneal, which appears to have been Carneal's principal concern. Rather, the purpose of the representation was to permit Potter to make medical decisions for Devin, which, under the circumstances, was in the best interests of everyone concerned. Accordingly, an action to protect the well-being and safety of Devin was not adverse to Carneal's interests, much less materially adverse.

Moreover, as noted by the trial commissioner, "[t]he crux of the Complaint is an alleged violation of SCR 3.130(1.9) and that allegation is unsubstantiated. Therefore, the other allegations fail." In addition, there was no violation of SCR 3.130–1.2(d) since the proof established that the true intent of the motion for de facto custodianship was as stated in the motion; there was no violation of SCR 3.130–3.3(a)(2) because the material facts were of public record in Carneal's criminal record and/or in prior domestic court records; and there was no violation of SCR 3.130–8.3(c) because there is no evidence that Respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in relation to his representation of either Carneal or Potter.

### 4. Summary

For the reasons stated, we adopt the determination of the Board that Respon-

dent is not guilty of each of the four charges contained in Case File 17439.

### ORDER

Based upon the foregoing findings, it is hereby ordered as follows:

1. Respondent is adjudged to be guilty of Counts III and V of the Binkley file relating to charging an unreasonable fee in violation of SCR 3.130–1.5(a) and comingling of funds in violation of SCR 3.130–1.15(a), and adjudged not guilty of all remaining counts contained in the four files under review.

2. For his violation of SCR 3.130–1.5(a), Respondent is suspended from the practice of law for thirty days, with the condition that he obtain six additional hours of CLE credits; and for his violation of SCR 3.130–1.15(a), Respondent is issued a public reprimand.

3. Respondent shall complete six CLE credits in addition to the number of required yearly CLE credits, with those additional credits being specific to office management, client agreements, and billing practice requirements under the applicable Supreme Court Rules.

4. Respondent may not apply for CLE credit of any kind for the additional credit hours. Further, Respondent must furnish a release and waiver to the Office of Bar Counsel to review his records in the CLE department that might otherwise be confidential, with such release to continue in effect for one year after completion of the ethics program to allow the Office of Bar Counsel to verify that none of the hours are reported for CLE credit.

5. In accordance with SCR 3.450, Respondent is directed to pay all costs associated with these disciplinary proceedings against him, said sum being $12,139.51, for which execution may issue from this Court upon finality of this Opinion and Order.

MINTON, C.J., ABRAMSON, CUNNINGHAM, NOBLE, SCOTT and VENTERS, JJ., concur. SCHRODER, J., not sitting.

ENTERED: November 21, 2012.

/s/ John D. Minton, Jr.
 Chief Justice